Charles D. McEWEN, Appellant,

v.

SPOKANE INTERNATIONAL RAILROAD COMPANY, Appellee.

No. 18171.

United States Court of Appeals Ninth Circuit.

Dec. 9, 1963.

R. Max Etter and Ellsworth I. Connelly, Spokane, Wash., for appellant.

Hamblen, Gilbert & Brooke and Fred Gilbert, Spokane, Wash., and Randall B. Kester, Portland, Or., for appellee.

Before CHAMBERS, ORR and BARNES, Circuit Judges.

CHAMBERS, Circuit Judge.

This is one of those unusual Federal Employers' Liability Act[1] cases where the jury returned a verdict against the injured workman and in favor of the railroad. Now the plaintiff appeals, asserting that the court under the principles of res ipsa loquitur should have instructed the jury that the defendant, on the facts, was liable (and, therefore, the only issue was damages), that his motion for new trial should have been granted, and that the court failed to give certain res ipsa instructions requested and gave some instructions that it should not have given.

The accident was a derailment on the company's main line the night of October 6–7, 1957. McEwen was the fireman on a freight train which had come from Spokane, Washington, and had stopped at Bonners Ferry in the Panhandle of Idaho. The track ran northerly to the Canadian border where, at the border ports of Eastport, Idaho, and Kingsgate, British Columbia, a connection was made with the Canadian Pacific.

McEwen and the rest of the crew had the very short run from Bonners Ferry, Idaho, to Eastport-Kingsgate and return. The run was so short they had to work on it every day of the week to get somewhere near the wages made by others in the respective crafts performing the same duties. McEwen and crew, on the night of October 6–7, simply moved into the places of their counterparts when the train rolled into Bonners Ferry.

As the train came to a very small place with a station called Meadow Spring, the derailment occurred. Perhaps cars behind the three-unit diesels left the track before the engine as the train ground or was brought to a halt by the engineer. There was considerable damage to several cars following the engines. McEwen was thrown about in the engine cab and certainly received painful injuries, compensable if there was liability.

Soon after the accident, the immediate cause of the trouble was found to be the condition of a hand switch on the main line for an infrequently used spur track[2] leading to a mill. Access to the spur track was gained by twisting a handle on the switch stand or standard connected to a vertical rod within the standard. (Of course, the mechanism goes on through levers and rods to the rails.) If the main line was open, the main face of the standard presented to an engineer and fireman was an arrow. If the spur was open, the face would be a red disc.

As the engineer and fireman approached the spur, they could and did see the face (side) of the arrow, which ordi-

1. 45 U.S.C. § 51 et seq.

2. The side track had originally been a passing track, but such use had been discontinued and the track at the far end from where the accident occurred had been spiked into an immovable position. The remaining use was to serve a warehouse or mill. Thus, we call it a spur track.

narily meant the main line was open ahead. What they could not see was that the hand arm of the switch was above and off the locking device, and the padlock connected with a chain to the standard was open and dangling, not performing its normal function of keeping the handle in place, which in turn would keep the movable rails involved in the switch in place for passage along the main line or up the spur. (Of course, at 90° the switch could be fastened secure for ingress to the spur.) Therefore, the movable rails were free to move under the passage of the engines and the freight cars, and they did move, with resulting injury to McEwen and damage to the train.

The case really revolves around the open padlock dangling on the chain. How did it get open and away from its accustomed position of locking down the arm on its standard? Who did it? Was the lock negligently left dangling and the arm slightly up by some workman in the performance of his duties? Was it opened maliciously by someone with a key, maliciously by someone who found the lock defective and able to snap it open, or by someone, perhaps a child, who was able to snap a defective padlock open and didn't realize the potentialities of his playfulness? And when was it done? Certainly the U-shaped arm (technically called a shackle or bow) of the lock was open at the time of the accident.

After a few hours,[3] the F.B.I. (Federal Bureau of Investigation of the United States) came and took the lock away. There seems to be no positive testimony as to whether the lock when it was seen on the stand during the several hours before it was removed by the F.B.I. was then so worn or damaged that it could be opened by a jerk on the chain connecting it to the standard.

Plaintiff-appellant looks on the case as strictly one of unexplained res ipsa. We think the plaintiff himself took it beyond that when he put on fellow employees to testify that snap-jerk (i. e., out of order) locks were quite common on the line of the Spokane International. On the other hand, the railroad came up with witnesses who told of frequent inspections for defects (including defective locks) along the tracks. There was also evidence from railroad witnesses that such snap-jerk defective locks were uncommon, but when found were always promptly replaced. One witness asserted he had inspected the particular switching standard as late as Friday, October 4, prior to the accident and found the whole of it in good order. The company also had evidence that the last time a train crew had used the spur track was six days before the accident. If the switch standard had been left unlocked at that time, one can assume that some difficulty would have occurred with one of the eight or ten trains that passed over the switch in the intervening days. We believe it fair to assume McEwen's train was the first one over the switch after it was put or left in its faulty condition. (Perhaps the jury could have believed that there was some use of the switch by the last train crew before the arrival of McEwen's train and that that crew negligently left the apparatus out of place and unlocked. But it apparently did not.)

Then the railroad put in evidence, basically unobjected to by McEwen, that in the near vicinity about a month before there had been a case of tampering with a switch on its line that could only have been explained reasonably as sabotage. In July, 1956, and early in 1958 there were incidents of sabotage. These incidents were not objected to as too remote.

■ We shall not enter into any discussion of res ipsa loquitur—the rule that when an instrumentality in one's exclusive control produces an accident, he who controlled must go forward and explain it, or pay. Thirty years ago it might have been held that there was not enough evidence here of exclusivity of control and that the cause of the accident was

---

3. The accident occurred about 4:00 a. m. The investigation by the company officials and the F.B.I. began soon after daybreak.

too speculative. We do not decide that plaintiff himself took the case out of res ipsa loquitur, because, assuming he did not, we hold that the defendant presented evidence from which the jury could have reasoned with some confidence that the accident was more likely to have been sabotage. It must have. While the law generally has abhorred "speculation as to cause," we think the test today is whether an intelligent inference as to cause can be drawn or whether the suggested cause is too fanciful. The standard nowadays is looser for plaintiff; likewise it must also be looser for defendant as to his theory of causation.

As we go along, we cannot help but comment that no one produced the accused padlock at the trial or produced any testimony as to tests for defects on the lock. On this point someone could have helped the jury, the trial court, and us. But it hasn't been done and we assume either party could have done it. We guess both sides were afraid of it, but that is beyond our function and perhaps none of our business. Such a failure may be one of the products of our adversary system.

We hold that defendant presented enough evidence of possible causes for which it would not be responsible for the case to go to the jury. We do not reach the question whether, as a bare question of law, if the only evidence had been the unlocked switch, a directed verdict should have been granted for McEwen.

■ We set forth in an appendix the instructions given by the court to which plaintiff objected seasonably. The plaintiff also excepted to the failure to give the following instruction tendered by the plaintiff:

"You are instructed that if you find that the plaintiff, Mr. McEwen, is free from any negligent conduct in connection with the derailment of the defendant's train, you would be warranted in finding that the exclusive control of the switch and the switch lock, and all the other instrumentalities, was in the defendant,

and with the fact of derailment there is reasonable evidence from which you would be warranted in finding the defendant railroad company was guilty of negligence."

The failure to give the foregoing instruction is really disposed of by what we have said to the effect that the whole case did not turn out to be one of simply res ipsa loquitur and no more. The element of possible outside interference by others at a time reasonably close to the time of the accident was strongly brought into the case. Therefore it would have been inappropriate to give the instruction in this particular case.

The court put together its own instructions. As to that portion of instruction No. 4 (shown in the appendix) to which exception was taken, in our judgment defendant must be overlooking the words: "if the defendant has furnished evidence which in your judgment is sufficient to rebut that inference," etc. We say there was evidence, if the jury chose to rely upon it, to rebut the inference. Under the instruction, it certainly could have ignored such evidence of the defendant, but apparently it did not.

As to Instruction No. 6 in the appendix, of course, standing alone, it might be subject to exception in a res ipsa loquitur case, but as part of the whole we find it unobjectionable.

The parties agree that Jesionowski v. Boston and Maine Railroad, 329 U.S. 452, 67 S.Ct. 401, 91 L.Ed. 416, is the leading modern case of the Supreme Court on res ipsa loquitur. We think the instructions show an awareness of the Jesionowski case. In Jesionowski the verdict was for the plaintiff with intermediate reversal by the circuit court of appeals of the first circuit, 154 F.2d 703. Then the Supreme Court reversed the circuit court. In Jesionowski the railroad's defense was its assertion that the accident was caused wholly by the plaintiff's own negligence. We find the trial court's instructions compatible with Jesionowski. Cf. Tittman v. Great Northern Railway Co., 9 Cir., 252 F.2d 793.

Further, we find the trial court did not abuse its discretion in denying its motion for a new trial. Of course, had it strongly felt the jury was wrong in its appraisal of the evidence, it could have granted a new trial. But plaintiff was not entitled to a new trial on the basis of the instructions.

We have here a case where one might believe industry should bear the loss just as is done in mining and manufacturing and other fields. But there is no workmen's compensation act for railroad employees. While the standards of fault seem to be ever loosening under the Federal Employers' Liability Act, still once in a while a jury will rule with the defendant. It could have ruled for the plaintiff here, but it did not.

The judgment is affirmed.

## APPENDIX

Instructions to which exception was taken by plaintiff:

*No. 4* "A party is not entitled to recover solely because there has been an accident. Any party claiming negligence has the burden of proving, by a fair preponderance of the evidence, that the other party was negligent in some one of the particulars claimed, and that such negligence was a proximate cause of the injury and damage claimed.

"The term 'proximate cause' means that cause which in a direct, unbroken sequence produces the injury complained of and without which such injury would not have happened.

"The term 'fair preponderance of the evidence' means the greater weight of credible evidence in the case. It does not necessarily mean the evidence of the greater number of witnesses, but means that evidence which carries the greater convincing power to your minds.

"The term 'burden of proof' means the burden of producing evidence which fairly preponderates over the opposing evidence.

" 'Negligence' is the failure to exercise reasonable and ordinary care, and by the term 'reasonable and ordinary care' is meant that degree of care which an ordinarily careful and prudent person would exercise under the same or similar circumstances or conditions. Negligence may consist in the doing of some act which a reasonably prudent person would not do under the same or similar circumstances, or in the failure to do something which a reasonably prudent person would have done under the same or similar circumstances.

"Evidence of instrumentality, when an instrument is shown to have been under exclusive control or management of an owner, or his servant, and an accident occurs which does not ordinarily happen if those who have the control and management use proper care, then you are entitled, in the absence of explanation, to infer that the accident arose from the want of such care and therefore the result of negligence.

"In this regard, you are instructed that the defendant has exclusive control and management over both the train and the switch, and you are at liberty to infer (but are not required to do so) that the defendant was negligent with respect to the operation of said train and switch.

"It is not necessary for the plaintiff under those circumstances to go further and prove particular acts of omission or commission on the part of the defendant from which the injury resulted, but the event itself makes proof of the inference of negligence from which the jury may infer that the defendant was negligent.

*"However, if the defendant has furnished evidence which in your judgment is sufficient to rebut that inference, you may not rely on the inference of negligence and may find for the plaintiff only if you find, by*

*a preponderance of the evidence, that the defendant was negligent."*

(The italicized portion above was especially excepted to.)

No. 6 "The law does not permit you to guess or speculate as to the cause of the plaintiff's injuries. If the evidence is evenly balanced on the issue of negligence or proximate cause so that it does not preponderate in favor of the plaintiff, then the plaintiff has failed to sustain his burden of proof and cannot recover."